**FORD MOTOR COMPANY et al., Appellants,**

v.

Daniel J. PUSKAR, Appellee.

No. 14317.

Court of Civil Appeals of Texas.

Houston.

July 8, 1965.

Rehearing Denied Sept. 16, 1965.

Appellee's Second Rehearing Denied
Oct. 7, 1965.

Finis E. Cowan, Houston, Baker, Botts, Shepherd & Coates, Houston, of counsel, for appellant Ford Motor Co., Inc.

Fulbright, Crooker, Freeman, Bates & Jaworski, Gibson Gayle, Houston, for appellant Jack Roach Bissonnet, Inc.

W. James Kronzer, Bill Allen, Ralph K. Miller, Houston, Miller & Gann, Hill, Brown, Kronzer, Abraham, Watkins & Steely, Houston, of counsel, for appellee.

BELL, Chief Justice.

Appellee recovered a joint and several judgment for damages in the amount of $60,815.33 by reason of personal injuries allegedly resulting to him from the negligence of Ford Motor Company and Jack Roach Bissonnet, Inc. Ford Motor Company will be hereafter referred to as Ford, and Jack Roach Bissonnet, Inc., as Roach.

Ford was the manufacturer of the 1959 Ford Thunderbird automobile that was bought on May 2, 1959 from the dealer Roach by appellee. In the early morning hours of May 31, 1959 appellee was involved in a one car accident at the intersection of Alief Road and Roark Road in Harris County. The automobile was equipped with power steering and power brakes. It was the general theory of appellee that the automobile when delivered to him by Roach was defective so that when he made full application on the brakes the engine would die and thus the power brakes and steering would not operate with power assist. As against Ford the theory of recovery was that Ford was negligent in falsely representing that if the engine was not running there would still be safe steering and control through conventional brakes and steering. At the time in question appellee was proceeding north on Roark Road, which is a gravelled road. Upon reaching a point from 125 to 200 feet from Alief Road he saw a stop sign controlling entry into Alief Road and made heavy application of the brakes, but there was no response. He, finding the brakes were not effective to effectively slow the automobile, then, when he got to the intersection, turned the steering wheel as hard as he could to the right but it would move only a very few inches and this was ineffective to turn the automobile. The result was that the automobile went on across Alief Road, which was about 33 feet wide, across a ditch and into an embankment. Severe personal injuries resulted to appellee.

At the time of the purchase Roach delivered its dealer's warranty, which reads as follows:

"Dealer warrants to Purchaser (except as hereinafter provided) each part of each Ford Motor Company produce sold by Dealer to Purchaser to be free under normal use and service from defects in material and workmanship for a period of ninety (90) days from the date of delivery of such product to Purchaser, or until such product has been driven, used or operated for a distance of four thousand (4,000) miles,

whichever event first shall occur. Dealer makes no warranty whatsoever with respect to tires or tubes. Dealer's obligation under this warranty is limited to replacement, without charge to Purchaser, of such parts as shall be returned to Dealer and as shall be acknowledged by Dealer to be defective. This warranty shall not apply to any Ford Motor Company produce that has been subject to misuse, negligence, or accident, or in which parts not made or supplied by Ford Motor Company shall have been used if, in the determination of Dealer, such use shall have affected its performances, stability or reliability, or which shall have been altered or repaired outside of Dealer's place of business in a manner which, in the determination of Dealer, shall have affected its performance, stability, or reliability. This warranty is expressly in lieu of all other warranties, express or implied, and of all other obligations on the part of Dealer."

Also at the time the automobile was delivered to appellee there was delivered to him by Roach a manual issued by Ford describing the various features of the automobile. The parts here material are the representations made in the manual with regard to the power steering and braking systems. They are as follows:

### MASTER-GUIDE POWER STEERING

"Up to 75% of the effort needed to steer your Thunderbird is taken over by Master-Guide Power Steering. Yet, this optional hydraulically operated steering system allows you to retain the natural feel of the steering wheel, particularly when you're driving your car along the open highway.

"Master-Guide Power Steering provides a power assist only when your Thunderbird's engine is running. However, even if your engine is stopped, or if the power system should not be operating normally, you'll have safe steering and full control of your car with conventional steering."

### SWIFT SURE POWER BRAKES

"The low-level pedal for the optional vacuum-operated Swift Sure Power Brakes system will operate with approximately one-third less pressure than the conventional brake pedal for most normal stops.

"If, for any reason, Swift Sure Power Brakes should completely lose their brake-assisting power, your Thunderbird's conventional hydraulic brake system will remain fully effective and it will take over to permit you to stop the car safely when you push down the brake pedal."

The jury found the following issues favorably to appellee as against Roach only:

Issue. 1. In purchasing the automobile appellee relied on the warranty that the automobile was free from defects in material and workmanship when normal use was made of the vehicle.

Issue 2. That from the time of delivery up to the time of the accident it was not free from such defects.

Issue 3. That the failure to be free from defects was a proximate cause of the accident.

Issue 20. After delivery the engine would die on full application of the brakes.

Issue 21. Appellee requested Roach to make such repairs or adjustments as were necessary to prevent the engine's dying.

Issue 22. Roach refused to make such repairs.

Issue 23. Such refusal was negligence.

Issue 24. Such negligence was a proximate cause of the accident.

The jury found the following issues favorably to appellee as against both Roach and Ford:

Issue 4. They represented that when the engine was stopped appellee would have safe steering and full control of the car with conventional steering.

Issue 5. At the time of the accident appellee relied on such representation.

Issue 6. The representation was untrue as applied to the operation of the steering system at the speed at which the car was moving just before the accident.

Issue 7. It was negligence to make the representation.

Issue 8. Such negligence was a proximate cause of the accident.

The jury also found in response to Special Issues 25 and 26 that appellee was acting in an emergency and that he, in such emergency, acted as an ordinarily prudent person would have acted in the exercise of ordinary care.

The jury found unfavorably to the appellee as to negligent representation as to brakes by finding the above quoted representation was not untrue—Special Issue 11. It also found unfavorably to appellee on the issue as to failure to warn by finding that appellants did not know, nor should they have known that if the engine died the braking and steering efficiency would be so impaired that appellee would be unable to safely control the car under the circumstances existing at the time of the accident —Special Issue 16.

Appellee was acquitted of all acts of contributory negligence, the jury finding no failure to properly apply brakes, no failure to keep a proper lookout, no excess speed, no negligence in failing to stop at the stop sign, no negligence in failing to take the car to Roach for adjustment and that appellee did not have full knowledge and appreciation of the risk involved in operating the vehicle. The appellee was also acquitted of driving while under the influence of in-

toxicating liquor and the jury found the accident was not an avoidable one.

Ford, as grounds for reversal, attacks the action of the trial court in submitting Special Issues 4 through 8, on the ground there was no evidence to support their submission, and also that the jury's answers were against the overwhelming weight and preponderance of the evidence. The answers to these issues are the only basis for judgment against Ford and their effect is to find Ford made an untrue representation to appellee that if the car engine stopped or the power system was not properly operating appellee would still have "safe steering and full control of the car with conventional steering;" that appellee relied on the representation; that to make it was negligence; and, that such negligence was the proximate cause of the accident. Also Ford makes the same attack on the submission of Issues 25 and 26 and the jury's answers thereto. These were all plaintiff's issues.

Ford also attacks, for the same reasons, the submission of Special Issues 27, 31 and 35, they being contributory negligence issues, and the answers of the jury to such issues.

The judgment against Roach rests on the jury's answers to the negligent representation Issues 4 through 8, and also the answers finding a breach of Roach's warranty against defects (Special Issues 1–3) and the jury's findings of negligent failure to repair (Special Issues 20–24). Roach, for reversal, attacks the submission of Special Issues 3, 4–8 and 21–24, on the ground there was no evidence to support their submission and that the jury's answers to these issues were against the overwhelming weight and preponderance of the evidence. Another point attacks the judgment being based on Roach's breach of warranty because his liability for breach is allegedly limited to replacement of defective parts. There is also the point that there was error in the form of Special Issues 1–3 in that there was global submission. Roach

also contends the evidence establishes contributory negligence as a matter of law and that the undisputed evidence shows appellee knowingly and voluntarily exposed himself to the risks and dangers incident to the operation of the car.

We must review the evidence.

Appellee testified he negotiated for the purchase of the automobile with Don Ferguson, a salesman for Roach. Appellee finally agreed to purchase the new 1959 Thunderbird automobile equipped with automatic transmission, power steering and power brakes. Delivery of the car was made by Ferguson May 2, 1959. At the time of delivery, the "Dealer's Warranty", hereinafter called warranty, was also delivered as was the "Owner's Manual", hereinafter called manual. Upon delivery of the automobile appellee read the instructions in the manual. He understood them, believed them and relied on them. The same is true with regard to the warranty. After delivery of the car appellee proceeded to drive it and with perhaps a few exceptions it seemed to operate fairly normally. A few days after he began to drive it the automobile seemed to be "Idling kind of roughly * * * possibly like a small motor boat engine, that type of rough idling that would be in neutral. It was rocking, so to speak." He observed no particular noise except it possibly sounded like it was out of tune. On several occasions when backing out of the driveway the motor died. The same thing happened in slow or congested traffic and when appellee would pull up to a stop sign. This also happened on other occasions when applying the brakes. Too, it happened on occasion when the motor was idling while the car was standing in traffic. He was no mechanic and did not know what caused it. When the motor died he noticed it took extra effort to apply the brakes but on the occasion prior to the accident, he was going so slow it didn't make much difference. He didn't have any real opportunity to test the steering because on the occasions the motor died he had no reason to turn the steering wheel. He had no occasion to apply the brakes or steer the car in an emergency. After he began this experience he called Mr. Ferguson at Roach's and told him of this trouble. Ferguson assured him this was normal behavior for a new automobile. Ferguson assured him the car was "letter perfect." He told appellee not to worry and to bring the car in when it was time to be serviced. The first conversation with Ferguson was about a week or 10 days after appellee purchased the car. On another occasion he also called Ferguson about the trouble because it was "frustrating." This call was around May 20, 21 or 22. At the time of these calls the car had not been 1000 miles. Ferguson told him to keep a record of the things wrong with the car so he could tell Roach about them when the car was brought in for a checkup. On this last occasion Ferguson referred him to someone in the service department. The person in the service department told him to wait until the 1000 mile checkup. On Saturday, May 30, the behavior of the car being about the same, appellee again called someone in the service department at Roach's. On this occasion he complained vigorously because nothing had been done by Roach. He was again assured the car was operating normally. He asked to be allowed to bring it in, but Roach's representative told him they could not service it then or Monday, but to bring it in on Tuesday. He agreed to do so, but stressed that he thought it was a very serious situation. The accident occurred in the early hours of Sunday, May 31.

At the time of the accident appellee was on his way to K.P.R.C. television station to play in an orchestra for a benefit for a blind fund known as "The Eyes of Texas." He was driving north on Roark Road, which is a shallow gravel 2-lane road. He was driving about 30 or 35 miles an hour. He drove until he saw an intersection. It was the Alief Road intersection. Roark Road dead-ends there. There was a stop sign controlling traffic on Roark Road as you enter Alief Road. He saw the sign

when he was from 125 to 200 feet back from the intersection, probably 150 feet. He stepped on the brake and got no response. He again stepped on the brake and it felt as though he might be pushing on the floor board, but again he got no response and the car kept moving. He then turned the steering wheel but it would turn only slightly. He had not reduced his speed to any extent that he could tell. The tires did not skid. He used all the force he had to try to turn the steering wheel. His efforts had no effect and he went on across Alief Road, the ditch on the north side and against the embankment.

Prior to purchasing the car he drove it in a normal fashion and the brakes and steering operated satisfactorily. After purchasing the car the engine died on him from four to six times. When he approached the intersection where the accident occurred he subconsciously had retained what he had read in the manual. At the particular moment he was not thinking of the book. He never took the car by Roach's for repair. The car operated satisfactorily on Saturday after he called Roach, until the time of the accident. He had no trouble with either the brakes or steering the balance of that day. The lights on the car were normal. He was not quite certain but he thought the lights were on high beam at the time of the accident. He saw the stop sign about the time it came within the beam of the lights. He applied his brakes and got slight response. On second application it felt like a frozen surface such as if the brake pedal went to the floor. The brake pedal, however, did not go to the floor. The pedal on first application went down about an inch and a half or two inches, possibly less. Appellee weighed 155 pounds and he pressed on the brake as hard as he could. He was holding onto the steering wheel while pressing on the brake. He did not skid. Appellee had made one previous statement in which he stated he thought when he applied his brake the car "skidded the sixty feet in sort of left side and forward motion" and in a deposition he

stated it skidded but he did not know how far. He explained he meant the car "slid". He didn't know how far. At the intersection he exerted the maximum pressure on the steering wheel of which he was capable in an effort to turn right. He imagined it was at least 50 pounds from each hand. The wheel turned only slightly, probably 2 or 3 inches, and then would not move. Appellee denied he told anyone he had had several drinks of an alcoholic beverage. He denied he had been drinking. Appellee testified he did not have someone else inspect the car because the warranty stated it would be voided, in the discretion of the dealer, if others made repairs or alterations. He knew if the motor stopped he would not have power assist but he relied on the statement in the manual and thought he would still have control over the car and would have proper braking power.

In his testimony in court appellee at no place testified the engine died just before the accident. In a statement he had made previous to trial, which was introduced, he stated he did not know whether the engine died or not but he felt at the time it did. The jury found it did die.

A friend of appellee, Mr. Eisenmann, once drove the car. As he went around the corner the motor stalled and he could feel the weight of the car as he steered it. He had trouble steering it but he had control of the car. He was driving about 10 miles per hour.

Mr. Mock, who worked for Roach, testified Roach serviced the car before delivery. They did not, however, install the power brakes or steering. The brakes and steering would have been installed by Ford. In pre-delivery service done by Roach no accessories were put on. If a customer complains about a motor idling roughly or dying, he considers that as affecting the driving or operation of an automobile equipped with power steering and brakes. If a customer complains about that condition, he would tell him to bring the car in. That is a warning whether the car is equip-

ped with power steering or brakes or not. It is dangerous for anyone to have a car dying in traffic. In the predelivery service the brakes and steering are road-checked. Also checked are engine timing, automatic choke settings, automatic fast idle preset, and the idle speed. Any necessary adjustments are made. Other things not here necessary to notice are checked. The predelivery check list on this particular car was not available. The road check consists of brake application, engine dying on medium and fast brake applications, front end pull on brake application and driving over rough roads, to listen for rattles. Because a new car is stiff it is nothing unusual for the motor to die on an inexperienced driver during the first 1000 miles. If rough idling is all that appears to be wrong with a car, it could be caused by incorrect mixture of air and gas in the carburetor and this would require an adjustment to the idle speed screw. It could be caused by leakage in high tension spark plug wires, and many other things. Any service station could make the carburetor adjustment. On a new car the idle screw is set so the car will idle faster and keep the motor from dying.

Mr. Ferguson, who sold the car, testified that when he delivered the car he told appellee to keep a list of the things he found wrong so he could turn it over to the service department when he had the 1000 mile inspection. He remembers appellee called him once or twice about the performance of the car. In making the sale he told appellee the car was guaranteed to be letter perfect, that there would be a few bugs in it as in any new car but they would be corrected. Appellee, when the car was delivered, drove it around the block a couple of times and it drove all right. Mr. Ferguson did not recall what appellee said to him on the occasions appellee called him about the operation of the car.

The accident was investigated by Mr. Graham of the Texas Highway Patrol. Most of the damage to the car was on the left front end. The car had hit the embankment almost head-on and then the back end swung around. The left two-thirds of the front of the car was damaged. The jolt of the accident was more to the left front. He could not tell whether there were any skid marks or not. The weather was clear and the road was dry. The ditch was wet. His notes made no mention of appellee having any odor of alcohol. Both roads were of flaky shell surface. The car jumped a pretty deep ditch. He could tell the car swung around by the plowed up curve made by the back tire.

The automobile was taken from the scene by Knapp Chevrolet. The evidence shows the automobile was traced from Knapp through several purchasers. It was sold by the finance company to a salvage company. The only repairs shown to have been done were done by a man named Whitis, one of the purchasers. He said no repairs were made to the power steering or power braking system. He didn't recall that any adjustment was made in the idle control but any car that has been in a wreck usually requires repair to the linkage system. He thoroughly road tested the car and the power brakes and power steering worked normally. The car was sold to several other persons and each purchaser testified to use of the power brakes and power steering and that they both functioned normally. One appraiser who examined the car, Mr. Barefoot, testified the power steering valve assembly was damaged in the wreck and estimated replacing it with a new one would be $28.50. However, the person repairing made no repairs on the power system.

■ We feel there is circumstantial evidence of probative force to support the jury finding that just before the accident the engine stopped firing. It is admitted, as stated in the representations contained in the manual, that if the engine is not running the power steering and power brakes will not operate though you will still have brakes and steering. We should here note that there is evidence that though the engine is not firing it will still be turning over so as to operate the power system if

the car is moving at a speed of as much as 35 miles per hour. There is also evidence that this is also true if the car is traveling at 30 miles per hour though there is evidence that while it is true of some cars at this speed it is not true of all cars. While appellants urge that the evidence shows appellee was traveling at least 35 miles per hour and the power system would still be operating, we feel from the evidence a jury could infer the car was traveling at a lesser speed so that the engine was not turning over. We are of the view that there was no evidence of probative force that there was any defect in the power braking or power steering systems in themselves that would cause the power not to operate. The only thing, under the evidence, that could be said to cause the power to fail would be the failure of the engine to fire due to improper adjustment of the idle screw, thus allowing an improper mixture of air and fuel. The result of these conclusions is that just before the accident appellee would have been without power brakes and power steering. This then brings us to the very important testimony bearing on the effect of the absence of the power.

Appellee relies upon the testimony of Professor James Melton of the University of Oklahoma. Professor Melton, as well as being a teacher, was a research and consulting engineer. Based on his research and experience, he testified he was familiar with the principles concerning the power brake and power steering systems of a 1959 Thunderbird. We should here note that our conclusion that the jury could have concluded the engine died is based in part on this witness's opinion, based on appellee's version of how the car acted just before the accident, that the loss of power was due to additional intake of air into the carburetor. He had made a number of tests with a number of different cars, including a Thunderbird. These tests were made in connection with some research in developing "constant torque idle arm assemblies." Power brakes are just con-

ventional brakes with power assist and will work just as well without the power. (The jury found the representation about conventional brakes was not untrue.) The power steering is a closed hydraulic system. "Closed" means you are using one individual reservoir with a pump through a valving arrangement to a cylinder that supplies power. The power pumps the fluid through the connecting linkage. This affords power that operates to help turn the steering wheel and thus in turn turns the front wheels on the car.

In an automobile equipped with power steering you have additional valving and linkage and a boost cylinder that boosts the pressure to move the linkage. The fluid must be moved back and forth through the linkage. If the power unit is not operating to boost the pressure to move the fluid the manual operation of the wheel must move the fluid through the linkage. In an automobile not equipped with power steering you do not have this additional linkage and no force is thus necessary to move the fluid through linkage. This is the reason it is more difficult to operate a car with power steering when the motor dies than it is a car that has only conventional steering. This is not true of brakes.

As above stated, Professor Melton's experiments with cars with the motor not running were with a 1959 Thunderbird and a number of other cars also. When asked on direct examination as to the additional pressure required, the witness answered:

"I do not recall the exact values. These tests were in connection with some research in developing constant torque idle arm assemblies, and I do know that the normal force necessary on a conventional car is about 12 pounds at the wheel, about seven pounds with power steering, and with the power assist steering assisting, and that it will run up, depending on the automobile itself, as much as 18 to 36 pounds and even beyond that when power steering is inoperative."

We take it this means the additional force needed varies depending on the make of the car because of his testimony just preceding this statement to the effect that he tested a 1959 Thunderbird and various other automobiles.

On cross-examination the witness Melton stated in making the tests he ran them "on a series of different General Motors products and also on Ford Motor Company products." Included in the cars tested were a 1957, a 1959 and a 1960 Thunderbird. He had no records of the tests with him so that he could not give his readings on the various tests. The tests were made at different speeds. The forces of 12, 7, 18 to 36 pounds stated above were, in some cases, while the vehicle was stopped. In some cases the tests were run between 30 and 40 miles per hour. In other words, as we interpret the testimony, these various pounds of force were necessary when some vehicles tested were stopped and some of them were required on some vehicles while they were moving. We are nowhere informed as to which figures applied to Ford products and which were applied to General Motors products. He did not testify as to which of these figures applied to a 1959 Thunderbird. When specifically asked if those figures were obtained at different speeds, the witness answered, "These are average figures." He then stated they were the averages "of a series of tests." He also said the figures were different depending on the speed. The witness explained that these figures were essentially the force necessary on various cars while standing still and thus overcoming friction. He stated this:

"That this figure seven, for instance, being one or two vehicles we had, was the force that was necessary to turn it on a conventional unit that had other steering assemblies involved and it was overcoming the friction on the rubber itself, on the pavement. That is the reason I told you these were average values and that they were statistical values arranged over quite a number of vehicles."

As to a 1959 Thunderbird, he stated it was going to depend on the miles on it, the steering linkage and quite a number of things. The effect of the tires, the speed, the gyroscopic effect, are to be considered. There is an extremely large number of things that can affect the steering. The witness testified it was harder to steer a 1959 Thunderbird equipped with power steering because of the force necessary to move the fluid back and forth through the linkage. In an effort to get the witness to testify as to how much force would be necessary to turn the steering wheel on a 1959 Thunderbird with power steering when the engine was not running, when the elements of friction, etc., were not involved, counsel asked if the witness had ever put one up on a grease rack and turned the wheel. He answered he had but did not have a record of what force was required. He did this as a part of a series of tests. He did not remember the force required. Whatever the numbers were went into the statistical analysis. He had no idea as to the force required. He then said he didn't think it would normally be more than 8 or 10 pounds. It would take more than that if the car wheels were on a surface because of the weight of the car being on the ball joints, the rod ends and a number of linkage elements. When asked how much extra pressure it would take on a 1959 Thunderbird where the car was driving on the road, he stated, "I would guess 20 to 30 extra pounds, but I don't know." Possibly it could be considerably less. The witness was then asked if he ever made any tests to find out specifically how much it would be and he answered, "On different automobiles; yes, sir." He was then asked if he tested a 1959 Thunderbird and he answered, "I don't remember the extent of all of these tests."

Mr. Chwalek, an experimental engineer in the power steering department of the Bendix Company, testified for the defendants. Bendix developed the power steering system used in the 1959 Thunderbird.

This witness testified that in a 1959 Thunderbird the gear ratio is the same whether you have one equipped with power steering or one without. In this car one pound of pressure exerted on the steering wheel produces 30 pounds on the Pitman arm. In some makes of automobiles, however, the gear ratio is different where equipped with power steering, and when the automobile is not so equipped. When the steering wheel is turned you move the Pitman arm. In developing the power steering study was made of what might be encountered if the engine stopped firing. Tests were conducted. Tests were made of 1959 Thunderbirds at various speeds, both automobiles with power steering equipment and those not so equipped. Tests were made of those so equipped while the motor was not running as well as when the motor was running. Based on these tests, if a 1959 Thunderbird with power steering was proceeding at 30 to 35 miles per hour with the engine running, from 3 to 6 pounds of pressure would be required to turn the steering wheel. If the engine stopped firing and there was a shift to neutral gear so the motor was not turning over, 4 to 8 pounds would be required to turn the wheel if the car were proceeding at 30 to 35 miles per hour. The driver still has control of the car. If the car is left in drive position at 30 to 35 miles per hour, the engine will still be turning over and the power system will work. As speeds increase it will take slightly less force to turn the wheel. If the speed is reduced to about 20 miles per hour it will take 6 to 10 pounds of force to turn the wheel if the power steering is working. If the power system is, for some reason, not working it would take the same force at the same speed under the same conditions. The reason greater pressure is required when the speed is reduced and the power assist is not available is that rolling friction is becoming closer to static friction. At 10 miles per hour with power steering working it would require 3 to 6 pounds. If power steering becomes inoperative, at 10 miles per hour it would take from 8 to 15 pounds. At 5 miles per hour with power

steering working, 3 to 6 pounds of force is required. If it is not working, 12 to 18 pounds would be required. The variance shown when a turn such as 12 to 18 pounds is used is because the force needed depends in part on the radius of the turn. A sharp turn requires more force. If the vehicle is stationary and the power system works, 6 to 10 pounds will be required. If the engine is turned off, a maximum of 50 pounds would be required. This last amount of pressure required is because of static friction. The same is required of cars not having power equipment.

In a car equipped with power steering but the power is not working, the driver will have to supply the power to displace the fluid in the hoses and pipes. If there were some obstruction such as a blister in them, it would interfere with the free circulation of the fluid. If a 1959 Thunderbird was not equipped with power steering and was proceeding at 30 to 35 miles per hour, it would require from 4 to 8 pounds of force at the wheel to turn. At 20 miles per hour it would require 6 to 10 pounds. At 5 miles per hour it would require 12 to 20 pounds. If the vehicle was stationary, it would require about 50 pounds. According to the tests he has conducted, there is no perceptible increase in the force needed to turn the wheel where the automobile is equipped with power steering which is not working and an automobile that is not equipped with power steering. If the vehicle is moving it takes no more force to turn the wheel on a 1959 Thunderbird equipped with power steering that is not operating than an automobile that is not equipped with power steering.

Professor Martin of Texas Tech. College made tests on a 1959 Thunderbird. He first turned off the ignition while the automobile was moving and left the gear in drive position. He then turned the ignition off and shifted to neutral. These tests were made when the car was traveling at various speeds between 20 and 50 miles per hour. At speeds over 20 miles per hour when the gears were in drive position the

power system still worked because the motor still turned over. Below 20 miles per hour the motor would stop turning. In each instance when the motor was not turning so there was no power, the steering and braking operated essentially the same as when the power was in operation. It operated the same as a car having only conventional equipment. To determine the force necessary to move the fluid through the linkage he put the car on a grease rack so that its wheels were off the floor. He turned the steering wheel the full distance right and left when the motor was operating and when it was not. In each instance he was able to make full turn of the wheel with the little finger. There was no more force needed to move the fluid with the engine off. The greater force needed to turn the wheel when the car is on the ground is not because of any measurable force needed to move the fluid in the linkage, but is due to drag caused by the wheels being stationary on the ground. He placed the car on the grease rack to determine this force necessary to move the fluid because if the car were stationary on the ground the drag thus caused would overshadow the force necessary to move the fluid. The force necessary to move the fluid would, however, be the same. The witness stated that the sensation of Puskar in having a hard brake meant he had made full application of the brakes. The sensation of turning the steering wheel and getting no response meant there was full application of the brake and there was sliding of the wheels like on ice or wet pavement and no force on the wheels which would tend to change direction of the car. He also testified on a basis of the physical facts, apart from damage to the car, that it was going at least 45 miles per hour.

In answer to Special Issue No. 4 the jury found Ford represented that if the engine of the automobile stopped or if the power system was not operating properly the plaintiff would have safe steering and full control of the car with conventional steering. Then, after finding reliance by appellee on the representation, the jury in answer to Special Issue 6 found the representation was untrue as applied to the steering system at the speed at which appellee's car was moving just before the accident. Then it answered, in response to Special Issue No. 7, that making the representation was negligence.

We have reached the conclusion there was no evidence of probative force supporting the answer or the submission of Special Issues Nos. 6 and 7.

We recognize that Ford, as the manufacturer of the automobile, is under a duty, if it assumes to speak, to speak truthfully concerning the operational attributes of its product. If it speaks untruthfully and such representation would not have been made by an ordinarily prudent person in the exercise of ordinary care under the same or similar circumstances, then a person relying on the representation is entitled to recover such damages as proximately result from such negligent representation. This was the theory on which the case was tried. It was not tried, as to Ford, on the theory of breach of warranty. We have no doubt that in Texas the rule is that there need be no privity between the purchaser and the manufacturer under these circumstances to recover on the theory of negligent representation. We discuss this briefly only because while at one point Ford seems to concede there need be no privity in a negligent representation case; at another point it urges absence of privity. An automobile is an instrumentality that can, because of its operational characteristics, become dangerous to the operator and others who occupy the highways. There are characteristics such as we have here with regard to the power steering system, that are a potential for danger if its operational attributes are not known. The operator without experience is very likely to have difficulty and face danger in learning by trial and error of such operational characteristics. This

fact was recognized by Ford when it made available to its dealers, to pass on to purchasers of Ford products, its manual which contained the representations involved here. It was in a position to know the facts that the operator could not know except through trial and error operation which process of learning involves undue risk to all who purchase the product and those within the foreseeable zone of operation. It is for this reason that the manufacturer has a duty to those within the foreseeable zone of danger to speak truthfully and non-negligently if it assumes to speak. That is the reason there need be no privity of contract between the manufacturer and the purchaser of its product; the suit is not for breach of contract.

While we have found no Texas cases dealing with the necessity of privity in these exact circumstances, we think the principles we have stated are established in similar situations such as liability of the manufacturer where his product is negligently manufactured and in the food for sale cases. We need not discuss them but merely cite Putnam v. Erie City Manufacturing Company, 338 F.2d 911 (5th Cir.). This cited case thoroughly discusses the Texas cases. There are cases from other jurisdictions that support liability of the manufacturer to the ultimate purchaser though there be no privity between them. Probably the leading case is that of Baxter v. Ford Motor Co., 168 Wash. 456, 12 P.2d 409, 88 A.L.R. 521; 179 Wash. 123, 35 P.2d 1090. Much has been written on this case discussing whether it was decided on breach of warranty or in deceit. See the following law review articles: 38 Michigan Law Review 964; 37 Michigan Law Review 1; 22 Washington Law Review 406; 18 Cornell Law Quarterly 445; and 42 Marquette Law Review 521. There can be no doubt, however, that the manufacturer has a duty such as we have above stated.

Here appellee bases his support of the jury's answers on the contention that the representation was that without the power steering operating the operator still would have safe steering and full control of the car with conventional steering. Conventional steering, he asserts, means the same steering as an automobile not equipped with a power steering system would have. He then urges it takes more exertion to turn the steering wheel where the automobile is equipped with a power steering system where the power system is not operating, than it does to steer an automobile not so equipped because if the power system does not operate additional manual force is needed to force the fluid through the linkage.

■ First, we must look at the whole of the language used by Ford to determine what its representation really was. The very first sentence of the representation about power steering states: "Up to 75% of the effort needed to steer your Thunderbird is taken over by Master-Guide Power Steering. * * *" Then in the next paragraph this is stated: "Master-Guide Steering provides power assist only when your Thunderbird's engine is running." Then follows the statement that if the power system is not operating the operator will have "safe steering and full control" of the car "with conventional steering." When all of the language is considered the representation is that if the power system is not working you will still have safe steering and control of the car because you will still have steering but it will require 75% more effort to operate than when the power system is working. The representation thus defines what is meant by conventional steering. And the opinion of all the experts is that with such you should be able to control the car.

The evidence, which we have above detailed, wholly fails to show falsity of the representation. Appellee's expert, who was his only witness on this issue, nowhere gives evidence of probative force to show that at the speed at which the car was moving just before the accident the statement

was false. He does not give testimony showing a 1959 Ford Thunderbird requires greater force to steer when the power is lost than is required in such a car not equipped with power steering. What testimony he gave was based on general experiments he had made with such a car and other makes, including General Motors cars. He could give no values as to a 1959 Thunderbird. His expressions were of averages based on all cars used and he admitted there were vast differences in different makes of automobiles. Too, the averages of force stated by him were based essentially on tests made while the cars were stationary. The only point in his testimony approaching evidence that the representation was false was where he testified, "I would guess 20 to 30 extra pounds, but I don't know." This is not an estimate based on recollection because he had stated he did not have the values he developed from his experiments and not only did he state he "guessed", but he immediately followed it by the statement he did not know. This is not of probative value.

The witnesses for Ford clearly testified to facts showing the truth of the representation. The result is that no witness testified to facts from which the inference could reasonably be drawn that the representation was false.

It follows that there is no liability by Ford, nor is there liability on this theory on the part of Roach.

We must, however, determine the liability on the part of Roach on the theory of warranty and negligent refusal to repair.

■ We are of the view that there was evidence of probative force, and it was sufficient to show that the automobile engine would die on full application of the brakes; that appellee requested Roach to make the necessary repair and adjustment to prevent it; that Roach refused; that such was negligence and such was a proximate cause of the accident.

A reference to the testimony above will show that a few days after the purchase appellee began noticing the engine would die on full application of the brakes. He was supported in this by one of his friends. He testified to calling Roach about this and was told to wait until the 1,000 mile checkup before bringing the car in. While no one at Roach's recalled any such report, one of Roach's witnesses testified if they had been called and this behavior had been described to them they would have recognized it was something to be concerned about and they would have told appellee to bring the car in without waiting. Roach recognized that if the condition existed it was obligated to make the necessary adjustment or repair. While the evidence does show that on Saturday, the day of the accident, Roach told appellee to bring the car in on Monday, when the testimony about the previous calls and Roach's telling him to wait until the 1,000 mile check-up is considered, we feel it is tantamount to a refusal to make the repairs when they should have been made. If they had been made the accident probably would not have happened.

Roach says it is not liable under its warranty because it limited its liability to a replacement of defective parts and a repair or adjustment of defective workmanship. Appellee's position is that apart from the express warranty there is an implied warranty of the fitness of the product for the use for which it was sold. Too, he urges that any such limitation asserted is against public policy.

As we construe appellee's pleading and Issues 1, 2 and 3, appellee did not rely upon any implied warranty in the trial court, but upon the express warranty. As a part of this warranty is the above-quoted limitation.

■ There seem to be no Texas cases directly in point. Appellee urges that American Coach Co. v. Hopkins, 355 S.W. 2d 83 (Tex.Civ.App.), ref., n. r. e.; Brandt-

jen & Kluge v. Tarter, 236 S.W.2d 550 (Tex.Civ.App.), ref., n. r. e.; and McCown v. Jennings, 209 S.W.2d 408 (Tex.Civ. App.), n. w. h., are controlling and that they do not give effect to any such limitation of this warranty. We think there was more than one warranty involved in those cases and the limiting language there discussed was not applicable to the warranty sued on. Here we think the limiting language was clearly applicable to the warranty of Roach that was sued on by appellee. We know of no public policy in this state that would prevent the parties from contracting so as to limit their liability as was done in this case. The contract of the parties must be given effect to. United States for Use and Benefit of Armco Drainage & Metal Products v. Vander Heyden, 158 Fed.Supp. 930 (U.S.D.Ct.S.D. Ill.); Shafer v. Reo Motors, Inc., 205 F.2d 685 (3rd Cir.); Runco v. Brockway Motor Co., Inc., 164 Pa.Super. 240, 63 A.2d 397.

The jury acquitted appellee of all acts of contributory negligence. The jury also found appellee was acting in an emergency and in such emergency acted as a prudent person. We find evidence of probative force to support the submission of all of these issues and we cannot say the jury's answers to any of them are so contrary to the overwelming weight and preponderance of the evidence as to be clearly wrong.

We do not feel the doctrine of volenti non fit injuria was applicable under the facts here present. Halepeska v. Callihan Interests, Inc., 371 S.W.2d 368 (S.Ct.).

In holding there is no evidence to show falsity of the representation of Ford and Roach, we do not reach the question as to whether the jury's answers in relation to this matter are contrary to the overwhelm-ing weight and preponderance of the evidence.

All complaints have been considered by us and those not specifically discussed are overruled.

The judgment of the trial court as to Ford Motor Company is reversed and rendered. The judgment of the trial court as to Jack Roach Bissonnet, Inc., is affirmed.

On Motions for Rehearing

In our original opinion we upheld judgment against Roach because of negligent refusal to repair. We rejected liability on the part of Roach based on its dealer's warranty that the automobile was warranted as being free from defects in workmanship and materials. The basis of our decision in this respect was that this warranty relied on by appellee expressly limited Roach's liability to replacement, without charge, of the defective parts or material. There was no pleading by which this limiting provision was attacked as being illegal because contrary to public policy. Appellee merely sued on the express warranty and he, therefore, in the absence of attack by pleading, took the warranty as it was written. On appeal, for the first time, so far as the record shows, he asserts the limiting language is contrary to public policy and therefore ineffective. We stated we knew of no such public policy in Texas. We feel such statement was really unnecessary to our decision because no issue of public policy was made in the trial court. We, therefore express no view as to this should it be properly raised in the trial court and on appeal.

The motions for rehearing filed by appellant Roach and appellee Puskar are overruled.