**JACK ROACH–BISSONNET, INC.,**
Petitioner,

v.

**Daniel J. PUSKAR, Respondent.**

No. A–11083.

Supreme Court of Texas.

March 22, 1967.

Rehearing Denied July 5, 1967.

Fulbright, Crooker, Freeman, Bates & Jaworski, Gibson Gayle, Jr., Houston, for petitioner.

Brown, Kronzer, Abraham, Watkins & Steely, W. James Kronzer, Houston, for respondent.

Baker, Botts, Shepherd & Coates, Finis E. Cowan, Houston, for Ford Motor Co.

WALKER, Justice.

This is a products liability case arising out of a one-car accident. Recovery is sought against the manufacturer and the dealer on grounds of breach of warranty, negligent misrepresentation, and negligence in refusing to repair. We hold that neither defendant is legally responsible for the accident, because the evidence is insufficient as a matter of law to show: (1) that the representation relied upon was false, or (2) that the accident was caused by the failure to repair or by any defect existing at the time the automobile was delivered.

Daniel J. Puskar, plaintiff, sustained personal injuries while driving alone in a 1959 Thunderbird automobile manufactured by Ford Motor Company. He had purchased the vehicle new from Jack Roach-Bissonnet, Inc., hereinafter referred to as Roach. Plaintiff brought this suit against Ford and Roach to recover damages for his injuries. The trial court rendered judgment on the verdict in his favor and against Ford and Roach, jointly and severally, for $60,815.33. The Court of Civil Appeals affirmed as to Roach, but reversed the judgment of the trial court and rendered judgment that plaintiff take nothing as to Ford. Ford Motor Co. v. Puskar, 394 S.W. 2d 1.

The accident occurred shortly after midnight at the T-intersection of Roark and Alief Roads in Harris County. On the occasion in question, plaintiff was driving the Thunderbird in a northerly direction on Roark Road, a graveled road which intersects but does not cross Alief Road. When plaintiff was some 125 to 200 feet south of the intersection, he saw the stop sign controlling vehicles entering Alief Road. He thereupon made a heavy application of his brakes, but there was little or no response. When the automobile reached the intersection, plaintiff attempted to turn to the right but the steering wheel would move only a few inches. He was unable to turn the vehicle, and it continued north across Alief Road, which is about 33 feet wide, across a ditch and into an embankment. Plaintiff was seriously injured in the accident.

When the automobile was purchased on May 2, 1959, plaintiff received from Roach its dealer's warranty that each part of the vehicle would be "free under normal use and service from defects in material and workmanship for a period of ninety (90) days from the date of delivery of such product to Purchaser, or until such product has been driven, used or operated for a distance of four thousand (4,000) miles, whichever event first shall occur." The warranty was expressly made subject to certain limitations and conditions which are not material under our view of the case. Plaintiff also received from Roach an owner's manual issued by Ford and describing various features of the automobile. The relevant portions of this manual are as follows:

## "MASTER–GUIDE POWER STEERING

"Up to 75% of the effort needed to steer your Thunderbird is taken over by Master-Guide Power Steering. Yet, this optional hydraulically operated steering system allows you to retain the natural feel of the steering wheel, particularly when you're driving your car along the open highway.

"Master-Guide Power Steering provides a power assist only when your Thunderbird's engine is running. However, even if your engine is stopped, or if the power system should not be operating normally, you'll have safe steering and full control of your car with conventional steering."

## "SWIFT SURE POWER BRAKES

"The low-level pedal for the optional vacuum-operated Swift Sure Power Brakes system will operate with approximately one-third less pressure than the

conventional brake pedal for most normal stops.

"If, for any reason, Swift Sure Power Brakes should completely lose their brake-assisting power, your Thunderbird's conventional hydraulic brake system will remain fully effective and it will take over to permit you to stop the car safely when you push down the brake pedal."

Plaintiff read the dealer's warranty and the owner's manual. He understood, believed and relied upon them. After delivery of the automobile, he proceeded to drive it and found that it operated normally with a few exceptions. The motor died once while he was backing out of the driveway, and the same thing happened on several occasions when the brakes were applied or when the motor was idling while the car was standing in traffic. Plaintiff noticed that extra effort was required in applying the brakes when the motor died, but he was moving so slowly that this did not make much difference. There was no reason to turn the steering wheel on any of these occasions.

Plaintiff telephoned Roach several times to complain about the performance of the automobile. He was assured that it was operating normally and was told to keep a list so the necessary adjustments could be made when the car was brought in for the 1000-mile checkup. On Saturday, May 30th, plaintiff telephoned Roach again and complained vigorously because nothing had been done. He asked to be allowed to bring the car in, but was told that Roach could not service it then or on Monday. Roach instructed him to bring the car in on Tuesday, which he agreed to do. The accident occurred in the early hours of Sunday, May 31, 1959. This was 29 days after Roach delivered the automobile to plaintiff, and it had been driven less than 1,000 miles at the time.

By their answers to the primary liability issues, the jury found: (1) that in purchasing the car, plaintiff relied upon Roach's warranty that the vehicle was free from defects, (2) that it was not free from defects, and (3) this was a proximate cause of the accident; (4) that Ford and Roach represented to plaintiff that when the engine of the automobile stopped or the power steering was not operating normally, he would have safe steering and full control of the car with conventional steering, (5) that plaintiff relied upon such representation, (6) which was untrue as applied to the steering system at the speed at which the car was moving just before the accident, and (7–8) the making of the representation was negligence and a proximate cause of the accident; (9) that Ford and Roach represented to plaintiff that if the power brakes of the automobile lost their brake assisting power or were not operating normally, conventional brakes would remain fully effective to permit him to stop the car safely, (10) that plaintiff relied upon such representation, but (11) the same was not shown to be untrue by a preponderance of the evidence; (14) that the engine of the automobile died just before the collision, and (15) when that occurred, the braking and steering efficiency was reduced to such an extent that plaintiff was unable to safely control the car under the circumstances then existing, but (16) it was not established by a preponderance of the evidence that this was known to or should have been known by Ford and Roach; (20) that after delivery of the car, the engine died upon full application of the brakes, (21) that plaintiff requested Roach to make repairs or adjustments to prevent such dying, and (22) that Roach refused to make such repairs or adjustments, (23–24) which was negligence and a proximate cause of the accident.

The jury further found (42) that the "collision" was not the result of an unavoidable accident, (25) that plaintiff was acting under an emergency and (26) acted as a person of ordinary prudence would have under the circumstances, (37) that there was some risk involved in operating

the car, but (38) that it was not established by a preponderance of the evidence that plaintiff had full knowledge and appreciation of the risks. It also refused to find: (29) that the plaintiff failed to keep a proper lookout or (27) failed to make proper application of his brakes, (31) that he was driving at excessive speed or (33) under the influence of liquor, or (35) that his failure to stop at the stop sign or (40) bring the vehicle to Roach for inspection and adjustment was negligence.

The judgment of the trial court against Roach thus rested upon breach of warranty as established by the jury's answers to Special Issues Nos. 1–3, negligent misrepresentation as established by the answers to Special Issues Nos. 4–8, and negligent failure to repair as established by the answers to Special Issues Nos. 20–24. The judgment against Ford was based upon negligent misrepresentation as established by the answers to Special Issues Nos. 4–8. Plaintiff insists that the judgment against Ford may also rest upon breach of an implied warranty of fitness, but the Court of Civil Appeals concluded that he had not relied upon that theory in the trial court. The intermediate court held that there is no evidence to show any misrepresentation regarding the steering mechanism of the automobile, and that the limiting language in the dealer's warranty was effective to exonerate Roach from liability for plaintiff's injuries based upon breach of such warranty. It upheld the judgment against Roach upon the basis of the jury's findings that the accident was proximately caused by the dealer's negligent failure to repair.

An accurate and rather full statement of the testimony given by the various witnesses will be found in the opinion of the Court of Civil Appeals. In upholding the judgment against Roach, the intermediate court began with the premise that there is circumstantial evidence of probative force to support the jury's finding that the engine

of the automobile stopped firing just prior to the accident. It then observed that motor failure was the only possible explanation afforded by the evidence for plaintiff's loss of power brakes and power steering, and concluded that the jury was entitled to find that the accident probably would not have occurred if Roach had made the necessary adjustments and repairs to prevent the engine from dying. In our opinion the latter conclusion is not supported by the record in this case.

There is no direct testimony that the engine died before the automobile ran into the embankment. In an ex parte statement which was introduced in evidence, plaintiff said that he did not know whether the motor died but felt at the time that it had. Three expert witnesses testified. Plaintiff offered Professor James O. Melton of the University of Oklahoma. Ford and Roach countered with the testimony of Mr. Richard J. Chwalek and Professor Robert E. Martin. None of these witnesses undertook to say, in response to a hypothetical question or otherwise, that the facts as related by plaintiff indicated that the engine had ceased firing. Professor Melton expressed the opinion that the difficulty plaintiff experienced probably was due to "an additional input of air into the system *so that you have a loss of vacuum in some manner.*"[1] He did not express any opinion based upon reasonable probability as to the mechanical cause of the additional input of air or the loss of vacuum.

The conclusion that the engine failed is itself an inference which must be drawn from plaintiff's previous experience with the vehicle and, more importantly, the loss of power on the occasion in question. Once that conclusion is reached, plaintiff would have us go full circle and say that engine failure caused the loss of the power assist for the brakes and steering, but even that is not enough. To sustain a recovery against Roach on the theory of negligent failure to repair, we must take one further step and

---

1. Emphasis throughout this opinion is supplied.

say that engine failure was the cause of plaintiff's inability to stop or turn the vehicle. It is here that the proof fails.

The undisputed evidence shows that a power-equipped 1959 Thunderbird has a vacuum reservoir which allows the driver to make two or three power-assisted applications of the brakes after the engine stops turning. Even when this reservoir is filled with air at outside pressure, the driver has conventional brakes which, if he applies to the brake pedal the force normally required for a vehicle not equipped with power, will enable him to slow or stop his automobile as quickly and effectively as with the power assist. It also appears from the undisputed evidence that the steering gear ratio of a 1959 Thunderbird equipped with power steering is the same as that of one not so equipped. In either vehicle one pound of force applied at the rim of the steering wheel produces 30 pounds of force at the end of the pitman arm. When the automobile is moving at a speed of 30 miles an hour, approximately 150 pounds of force at the end of the pitman arm is required to turn the front wheels. If the vehicle is equipped with power steering, turning the steering wheel in either direction causes the linkage to move and actuates the valve assembly. This permits fluid under pressure to flow to the appropriate side of a cylinder, which supplies part of the force required to turn the front wheels.

As pointed out by the Court of Civil Appeals, there is no evidence of any defect in the conventional braking or steering systems or the power assist of either that would cause the same not to operate. Plaintiff had no difficulty with the brakes or the steering prior to the accident. A friend who was driving the automobile on one occasion when the motor died said that he had trouble steering, and then went on to explain:

"It wasn't the first time I had driven it, and I was used to the power steering. All of a sudden when it goes out, it was quite a change, and I could feel the weight of the car and the weight of the

engine and so on; whereas, before, I could not. There was very little effort to turn the corner when the engine was running, but when the engine stopped, evidently the power steering went out and it just caught me off guard and, of course, nothing happened. *I had control of the car.* There were no other cars around, but there was a very definite difference in the pull of the car."

An appraiser who examined the automobile after the accident noticed a dent in the power steering valve assembly. When asked to describe the dent, which the witness assumed was caused by the wreck, he answered:

"It was damaged from a blow. If memory serves me correctly, it was damaged from a blow of concrete or—anyway, it was marked like if you run into a curb or concrete, you will skin it. It is not a smooth skin but it is an indentated skin."

The witness thought the valve assembly would have to be replaced. It appears from the undisputed evidence, however, that no repairs were made to either the power braking or power steering system after the accident, and yet the automobile operated satisfactorily with no difficulty in the brakes or steering. The only defect in either material or workmanship fairly raised by the evidence as having been present when plaintiff purchased the automobile was an improper adjustment of the idle-speed screw on the carburetor. The jury could reasonably conclude that this caused rough idling and engine failure at low speeds, but our question is whether the evidence will support the further conclusion that it caused the accident and plaintiff's injuries.

The motor of plaintiff's automobile had died on five or six previous occasions. This occurred when he was backing out of the driveway at his home, pulling up to a stop sign, applying the brakes or standing in traffic with the motor idling. According to his testimony, "two instances that

I can think of for sure in traffic was during idling," and "when this would happen when the car was in motion, it was such a *minute motion that it didn't make too much difference.*" On the basis of plaintiff's experience then, the motor died when it was idling or when the vehicle was moving very slowly. Neither of these conditions obtained at the time the engine is said to have stopped just prior to the accident.

Plaintiff testified that he was driving about 30 or 35 miles an hour when he observed the road intersection. He may have been somewhat high in this estimate, but it is clear that the engine was turning, and the automobile was moving, at a fairly rapid rate. These are not the circumstances under which motor failure had occurred in the past. Of even greater significance is the fact that plaintiff got only "a slight response" *when he first applied the brakes.* Although plaintiff pushed on the brake pedal as hard as he could, the wheels of the car did not lock and skid; the speed of the vehicle was not reduced. Under the facts as related by plaintiff, the motor almost certainly was turning and firing at the instant the brakes were applied, and there is no reasonable basis for concluding that the initial malfunction of the brakes was caused by engine failure. The motor may well have stopped firing shortly after the brakes were first applied, but the record is devoid of any evidence to warrant the belief that this would or even could have impaired or affected the operation of the conventional brakes. It is clear, moreover, that a person of plaintiff's size and physical condition would have no difficulty in making a full application of the conventional brakes even without help from the power assist. A dying engine does not account, therefore, for his inability to stop the automobile before it ran into the embankment.

When the automobile reached the intersection, plaintiff attempted to turn to the right. He was about 5 feet 8½ inches tall, weighed 155 or 160 pounds, and was in good physical condition. He had both hands on the steering wheel and used both in attempting to turn the automobile. Although he "turned that steering wheel with everything" he had, exerting the maximum effort of which he was physically capable, the wheel would move only some two or three inches. It then locked and would not turn further. Plaintiff was thus able to turn the car only "a very slight bit," and it went across Alief Road and into the embankment.

The witness Chwalek is an experimental engineer employed by the Bendix Corporation, which manufactured the power steering system used on the 1959 Thunderbird. He testified that when a power-equipped 1959 Thunderbird is moving in gear at a speed of 30 to 35 miles an hour, the engine will be turning even though it is not firing and the power steering will thus be operating. Professor Martin, who is associate professor of Mechanical Engineering at Texas Technological College, had made a number of tests with a 1959 Thunderbird. He found that when the vehicle was moving in gear at speeds of from 20 to 50 miles per hour, turning off the ignition did not affect either the power brakes or the power steering. Professor Melton said that while the engine was likely to be turning when the vehicle was moving 35 miles an hour, it might or might not be turning at 30 miles per hour. When the evidence is viewed in the light most favorable to plaintiff, we think the jury was entitled to conclude that the power steering was not operating when he attempted to make his turn. This does not, however, explain his inability to make the turn with conventional steering.

Mr. Chwalek was responsible for the development of the power steering system used on the 1959 Thunderbird. He testified that in developing the equipment, consideration was given to problems that might

be encountered if the engine stopped firing. Tests were made to determine what effect this would have, and the results of these tests were as follows:

| | 30 mph | 10 mph | 5 mph | 0 mph |
|---|---|---|---|---|
| Speed of vehicle | | | | |
| Effort required to turn steering wheel with power steering operative | 3–6 lbs. | 3–6 lbs. | 3–6 lbs. | 6–10 lbs. |
| Effort required to turn steering wheel with power steering on vehicle but not operative | 4–8 lbs. | 8–15 lbs. | 12–18 lbs. | 50 lbs. approx. |
| Effort required to turn steering wheel on Thunderbird not equipped with power steering | 4–8 lbs. | 8–15 lbs. | 12–18 lbs. | 50 lbs. approx. |

————◆————

According to the tests conducted by this witness, there is no perceptible difference in the amount of force required to turn the steering wheel of a 1959 Thunderbird equipped with power steering that is not operating and the amount required to turn the steering wheel of such a vehicle not equipped with power steering. This was confirmed by tests made on a 1959 Thunderbird by Professor Martin. He found that the power-equipped 1959 Thunderbird, when moving with the gear in neutral and the ignition turned off, "operated just like a car with conventional steering and conventional brakes." To determine whether additional force was required to move the power steering fluid through the linkage when the system was not operating, he placed the vehicle on a grease rack with its wheels raised off the floor. He was able to spin the steering wheel from one extreme to the other with his little finger when the engine was running and when it was not running. According to his testimony, there was no measurable difference in the amount of force required.

On the other hand, Professor Melton testified that it is more difficult to steer a power-equipped automobile when the engine is dead than one which does not have the power assist. He stated that this is due to the additional force required to move the power steering fluid through the linkage. The witness also said that he had tested a 1959 Thunderbird raised on a grease rack with its motor off, and that the steering wheel could not be turned with the little finger. He "believed" that he had measured the force required, but did not "remember the numbers. In fact, I believe these numbers went into our statistical analysis."

According to Professor Melton's testimony, "the normal force necessary on a conventional car is about 12 pounds at the wheel, about 7 pounds with power steering and with the power steering assisting, and that will run up, depending on the automobile itself, as much as 18 to 36 pounds and even beyond when the power steering is inoperative." These figures are the averages of a series of tests made by the witness upon various automobiles. He had no records of

the tests with him, and was unable to give the readings for any particular vehicle at any particular speed. The automobiles tested included a 1957, a 1959 and a 1960 Thunderbird, but they also included an undisclosed number of vehicles made by General Motors. It appears from the evidence that some automobiles equipped with power steering do not have the same steering gear ratio as the identical make and model when not equipped with power steering. Aside from the three Thunderbirds, the facts concerning the steering gear ratios of the vehicles tested by Professor Melton are not shown. And while his testimony as to the speed at which the tests were made is quite vague and contradictory,[2] it is clear that at least some and perhaps all of the readings were taken while the vehicles were standing still.

Professor Melton's tests and figures are thus of no value in determining how a power-equipped 1959 Thunderbird might perform when moving at 30 or 35 miles an hour with its engine dead. He was unable to express any opinion as to the additional force required to turn such a vehicle under those circumstances. When interrogated on that point, he answered "I would guess it could take up to maybe twenty or thirty extra pounds, but I don't know." The jury could only speculate then as to what the witness meant when he said that "considerably more effort" is required to steer a power-equipped vehicle with its engine dead than a similar vehicle not equipped with the power assist. Be that as it may, there is nothing in his testimony or elsewhere in the record to support the conclusion that engine failure would probably render a 1959 Thunderbird, moving at any speed approaching 30 or 35 miles an hour, so difficult to steer that a driver of plaintiff's size and physical condition would be unable to guide and turn the same with conventional steering. Under the evidence, a dying engine simply will not account for plaintiff's inability to turn the steering wheel more than two or three inches.

2. Q. What speeds were you running these tests at?
A. We ran these through a series of different speeds. I probably could make this much more clear to you with somewhat of an explanation.
Q. Well, sir, you will be afforded an opportunity to do that. What I am asking you is: What speeds were you using when you got these figures of twelve, seven and eighteen to thirty-six that you mentioned a little earlier?
A. I believe that these speeds were essentially at—Well, there were, in some cases, vehicles that were stopped. In other cases, they were somewhere between thirty and forty miles an hour. There were a series of tests.
\*       \*       \*       \*       \*       \*       \*
Q. These figures you have given us: twelve, seven and eighteen to thirty-six, those were done with vehicles stopped, weren't they?
A. Not necessarily.
Q. Well, were they?
A. Not all of them.
\*       \*       \*       \*       \*       \*       \*
Q. And is the truth of the matter that those figures of twelve, seven and eighteen to thirty-six, were obtained with the automobile sitting dead still?

A. In some cases.
Q. Well, sir, you have given me one set of figures: twelve, seven, eighteen to thirty-six. Were those three figures obtained at different speeds?
A. These are average figures.
Q. Average of what?
A. Of a series of tests.
Q. What are you averaging?
A. I am averaging values.
\*       \*       \*       \*       \*       \*
Q. Now, all these figures are different, depending on what speed the automobile is going, aren't they?
A. Yes, sir.
Q. What I am asking you is a very simple question: How fast was the automobile going when you got those figures?
A. These figures essentially are fixed figures. In other words, the vehicle isn't moving.
Q. That is exactly what I have been trying to find out. This is when the automobile is standing still.
A. That is not necessarily true.
Q. Didn't you just say they are figures that are fixed, when the car is fixed and the engine not running?
A. Essentially, yes.

The idle-speed screw of the carburetor may not have been properly adjusted when the automobile was delivered to plaintiff, but that is the only defect existing at that time which the jury could reasonably find under the present record. In our opinion there is no evidence to warrant the belief that the accident was caused by this defect or by Roach's failure to repair the same. Without proof as to what did cause the brakes and steering not to function, the jury had no way of knowing whether the failure of either was due to a defect in the car at the time of its delivery. Liability may not be predicated then upon any theory of either breach of warranty or negligent refusal to repair.

The jury also found in response to Special Issue No. 6 that the representation in the owner's manual concerning the steering was false. In discussing such representation, the Court of Civil Appeals stated that the manual made it plain that 75% more effort would be required to operate the steering when the power system was not working. A fair and more accurate construction of the manual is that the driver will find it necessary to exert up to four times as much effort to steer when the power is lost.[3] Subject to this relatively minor correction, we agree with the Court of Civil Appeals for the reasons set out in its opinion that there is no evidence to support the jury's answer to Special Issue No. 6. This leads to the conclusion that judgment should have been rendered in favor of both Roach and Ford.

The judgment of the Court of Civil Appeals is accordingly modified so as to reverse the judgment of the trial court and render judgment that plaintiff take nothing. As so modified, the judgment of the Court of Civil Appeals is affirmed.

SMITH and POPE, JJ., dissenting.

SMITH, Justice (dissenting).

I respectfully dissent.

While the Court recognizes that Puskar in this suit seeks recovery against Roach, the dealer, and Ford, the manufacturer, on grounds of breach of warranty and negligent misrepresentation, it has failed to properly interpret the instruments containing the representations and to evaluate the evidence which supports the findings of the jury which fix the responsibility of Roach and Ford insofar as the representations in the "Owner's Manual" and the representations made by Roach are concerned.

The Court not only makes the same mistake as that made by the Court of Civil Appeals, but apparently accepts the argument of Ford that the only way for Puskar to recover is to establish and secure a finding that the 1959 Thunderbird was defective at the time it left the control of the manufacturer.

This dissent takes note of the evidence relating to Puskar's cause of action based on the ground of negligence of Roach in refusing to repair the Thunderbird only so far as such evidence is related to his major grounds for recovery, breach of warranty and negligent misrepresentation. If there is any doubt as to Puskar's principal contentions, such doubt will disappear upon reading Puskar's pleadings and his testimony beginning with the first pages of the statement of facts.

Puskar recognizes that there is no proof in this record of any defect in the Thunderbird at the time it left Ford's control. Puskar contends, however, that defectiveness in the design of the Thunderbird or its manufacture is not the question before the Court. I agree with Puskar's contention that the cases relied upon by Ford do not limit the theory of false or negligent mis-

---

3. The manual states that "up to 75% of the effort needed to steer your Thunderbird is taken over by the Master-Guide Power Steering." If 75% of the required effort is supplied by the power steering, the driver supplies the remaining 25%. When the power assist is lost, the driver must furnish 100% of the required effort, or four times as much as with the power assist operative.

representation to defects in the design or manufacture of the Thunderbird.

In the very beginning of the trial the testimony of Puskar was introduced to show a history of Puskar's origin, background, training and experience as a musician. The testimony in regard to the Thunderbird begins immediately thereafter. In April, 1959, a friend was responsible for his meeting with a Roach representative. The evidence shows that Puskar purchased the 1959 Thunderbird on May 2, 1959; that Don Ferguson was the salesman for Roach who handled the sale. Puskar, in his testimony, presented the primary basis for his cause of action for damages. Early in connection with his testimony there appears in the statement of facts plaintiff's exhibit No. 2, designated as a dealer warranty. This warranty was delivered to Puskar at the time of delivery of the Thunderbird. Puskar's attorney immediately read to the jury a part of the dealer's warranty, which reads:

"The dealer warrants to the purchaser, except as hereinafter provided, that each part of each Ford Motor Company product sold by dealer to purchaser, to be free, under normal use and service, from defect in materials and workmanship, for a period of 90 days from the date of delivery of such product to purchaser or until such product has been driven, used, or operated for a distance of 4,000 miles, whichever event shall first occur."

Immediately thereafter, Puskar introduced exhibit No. 3, the "Owner's Manual", and read to the jury a part thereof beginning at page 26 (of the manual) as follows:

"Master guide power steering. Up to 75% of the effort needed to steer your Thunderbird is taken over by master guide power steering, yet this optional hydraulically operated steering allows you to retain the natural feel of the steering wheel, but particularly when you are driving your car along the open highway. Master guide power steering provides a power assist only when your Thunderbird's engine is running; *However, even if your engine is stopped or if the power system should not be operating normally, you will have safe steering and sure control of your car with conventional steering.* [Emphasis added.]

"Swift sure power brakes. The low level bevel of the optional vacuum operated swift sure power brake system will operate with approximately one-third less pressure than the conventional brake pedal for most normal stops. *If for any reason swift sure power brakes should completely lose their brake assisting power, your Thunderbird's conventional hydraulic brake system will remain fully effective, and it will take over to permit you to stop the car safely when you push down on the brake pedal.*" [Emphasis added.]

Puskar gave the same testimony as to the dealer's warranty.

To recite all of the evidence bearing on the question which the jury was allowed to hear would unduly lengthen this dissent. However, some of the evidence will be set out to demonstrate misrepresentations in the "Owner's Manual" were emphasized by the representatives of Roach both before and after the sale of the Thunderbird. As a consequence it was negligently represented to Puskar that when the engine of the automobile in question was stopped or if the power system should not be operating normally that he would still have safe steering and full control of the Thunderbird with its conventional steering. The representations made by the salesman were in harmony with Puskar's interpretation of the language of the "Owner's Manual". Puskar relied upon all such representations not only at the time of purchase but continued to rely thereon until the time of the accident. Puskar's testimony follows:

"When the automobile was delivered he read the Owner's Manual and understood the instructions. He believed them. He relied upon the statements. He had no reason to disbelieve them. He also read

over the warranty, understood it, believed it, relied upon it and had no reason to disbelieve it.

"When he first obtained the car it seemed to operate 'fairly normal' with a few exceptions. One thing he noticed shortly after he began to drive it was that he 'would realize that the automobile was idling unusually'. He described this further as 'idling kind of roughly.' He likened it to a motor boat engine that was idling and sort of 'rocking'. It would cause vibrations inside the car. It acted like it was 'idle tuned'. On several occasions when he was backing from his carport to the driveway the 'automobile stalled on me.' This happened several times thereafter in the course of slow or congested traffic.

"He did not know what caused it, not being schooled in mechanics. The first time this happened was when he started up the car. When he would pull up to a stop sign, apply the brakes, or in idling, standing in traffic, idling, it would stop. It happened several times. On these occasions, when the motor would die, he would have no real opportunity to use the power brakes or power steering because it happened in the course of very slow driving. He had no chance to 'test it out'. The brakes would take an extra special effort to stop the automobile on these occasions. On none of these other occasions had he had any opportunity or necessity to turn the wheel. None of these failures had occurred in an emergency.

"He called Jack Roach and talked to Ferguson, and told him the troubles he had. Ferguson reassured him that the car was 'operating normally', 'it was getting the kinks out of it so to speak, and once again, he mentioned that the Ford product was a letter perfect automobile.' The court admitted this testimony for the limited purpose of showing why he continued to drive the vehicle in view of these assurances, but not for the purpose of proving up an 'oral' warranty.

"Ferguson reassured him that the automobile was in the 'breaking-in' stage, and that the automobile would be handled by the Service Department at Jack Roach 'upon proper time'. Ferguson told him that the problem was 'just in the course of breaking in a new automobile that these things would happen; that I would have nothing to worry about.' At this point the Court overruled an objection upon the grounds that the evidence indicated an 'oral warranty'.

"The first conversation with Ferguson occurred approximately a week after he had purchased the automobile, possibly ten days. The stalling continued on several occasions, and 'it was a frustrating situation.' He called back and talked to Ferguson a few days to a week before the accident, on May 20, May 21 or May 22. He did not have a thousand miles on the auto. He was reassured again and told to 'write down anything that I thought was the matter with the car, and when I would take it in for my check-up, then I would present this notebook to the people in the Service Department, at which time, he told me I should talk to someone in the Service Department'. He did talk to someone in the Service Department, but he could not remember his name. It was something like the Sales Manager or someone connected with handling customers.

"The people in the Service Department were very nice and stated that 'I should wait until my 1000-mile check-up and I would have all these things taken care of at one time'. He continued to drive the car after this conversation. The car continued to act in approximately the same way and did not improve. It continued to die on him.

"On the 30th day of May, 1959, he made another telephone call to Jack Roach for the purpose of getting the car taken care of. It was before lunch on a Saturday,

and he talked to someone in the Sales Department. He was 'very displeased with the way the automobile had been handling, and * * * was hoping to have the car fixed, repaired, tuned up, or whatever it took to get it in operating condition.' He was once again reassured that the car was acting the way any new automobile would and that, 'I was being possibly a little presumptuous or a little nervous about driving a new car and I shouldn't worry about it.' "

Puskar described the events leading to the accident as follows:

"I drove until I saw in front of me an intersection, which I have come to find out that this is the intersection of Ruark and Aleif Road. Realizing that this was an intersection, and right in front of me was a dead stop, a dead end, I started to apply my brakes, at which time *I got no response,* and realizing that I could not stop the automobile or handle it at that time the way I felt I should be able to handle it, I stepped on the brake and I felt as though I might be pushing against the floorboard, with no response from the brake; and still moving ahead, I started to turn the wheel. I was able to turn the wheel only slightly, and this slight turn and me not being able to stop the automobile, I headed into a small ditch and embankment with the left front side of my automobile.

"When he first applied the brakes there was practically no response. The brakes seemed a little 'spongey, and then it was as though I was pushing against the floorboard. Nothing happened.' It did not reduce the speed. It did not cause the brakes or wheels to lock. He was only able to turn the steering wheel slightly 'after I seemed to get out in the middle of the road.' He then described when he was able to make a turning movement in the following manner:

" 'When I got the front end of the car out into the road, by just force, I guess, I was able to turn it just a little bit.' "

James L. Melton, a witness called by the plaintiff, Puskar, testified in substance as follows:

"He was a professor at the University of Oklahoma and a consulting engineer. He stated he was familiar with the engineering principles concerning power brakes and power steering of the 1959 Thunderbird. The power steering system is a 'closed' system using a separate, distinguishable reservoir in pumping the system into a second reservoir. The braking system is essentially vacuum operated and it applies assisting power. For either or both to operate properly it is necessary that the engine of the car be operating.

"Ralph [Miller—plaintiff's attorney] posed a hypothetical question to him concerning the manner in which the accident occurred and he had an opinion as to some of the possible causes for the malfunctioning of the steering wheel and the brakes on the occasion in question. He had an opinion as to the reasonable probability as to the cause of the difficulty the plaintiff experienced. There was probably an additional input of air into the system so that you had a loss of vacuum which tends to give you a lean mixture so that a loss of power can result. He then said 'this loss of power will further tend to aggravate the condition as far as the power brakes are concerned, since it is directly connected to the manifold through which this mixture is administered to the cylinders.' Additionally, 'in the loss of power, depending on the gear ration applied to the power drain, itself, the engine may or may not function. Its rotational speed might drop below the minimum necessary to produce the necessary pressure in the system to react, as far as the power steering is concerned.'

"The power brake system is tied directly to the manifold, such that if there is some failure of any type, such that we have a loss of the vacuum that is produced by the drawing of the fuel, or the air through the carburetor and mixing it

with fuel, we do have some mixing, but in addition to that, then we get excess air in our system. He positively testified that a car with power steering and power brakes which fails will not operate as easily as a car with only conventional equipment. Then, significantly, he gave the following testimony:

'Q. I will ask you whether or not it takes considerably more effort to put the brakes and steering into effect whenever the motor dies on a car that is equipped with a power system, than it does a car with conventional steering and conventional brakes?

'A. *On steering, yes.* Brakes, no.

He explained this as follows:

'Since we have added additional linkages or valving and a boost cylinder (which was replaced), a cylinder that actually boosts the pressure up to move the steering linkage, itself, the steering linkage is connected directly to the power cylinder and the difference between reaction, between the non-power-assist steering and the conventional steering, is essentially that you must move the fluid back and forth in your system as well as the connecting linkage.

'In the conventional system, you do not have this additional work to do.'

"He had conducted tests with 1959 Thunderbirds and with other cars as well when the motor is not running with reference to the amount of pressure required to turn a steering wheel. While he did not recall the exact values he did 'know that the normal force necessary on a conventional car is about 12 pounds at the rim of the wheel, about 7 pounds with power steering, and with the power assist steering assisting, and that it will run up, depending on the automobile itself, as much as 18 to 36 pounds, and even beyond that when the power steering is inoperative.'"

The evidence introduced in the trial court presents a case of joint liability against Roach and Ford. The jury absolved Puskar of contributory negligence. The fact that Puskar continued to operate the Thunderbird after he realized that the Thunderbird was "idling unusually", etc. does not preclude recovery. Puskar was not required to refuse to continue to operate the Thunderbird as a condition precedent to maintaining his cause of action on the grounds of breach of warranty and negligent misrepresentation. Puskar relied on the "Owner's Manual" and dealer's warranty as well as the sales advertising to the public generally. Such reliance is sufficient to support a cause of action based on breach of warranty and negligent misrepresentations. See Inglis v. American Motor Company, 3 Ohio St.2d 132, 209 N.E.2d 583 (1965), Greenman v. Yuba Power Products, Inc., 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897, 901 (1962); Lang v. General Motors Corporation, N.D., 136 N.W.2d 805 (1965); Ford Motor Company v. Lonon, 398 S.W.2d 240, 242 (Sup.Ct.Tenn.1966).

The facts here bring this case within the rule that where a manufacturer has misrepresented the quality of his product or negligently makes misrepresentations as to his product generally, such manufacturer should be held responsible for harm resulting from a characteristic common to all such products of that kind. The evidence and jury findings also support the breach of warranty theory advanced by Puskar. It has been held that express misrepresentations are also to be regarded as express warranties. Cases in other jurisdictions where liability has been predicated on misrepresentations of facts have, in the main, been cases where there was no miscarriage in the manufacturing process, but where there was a misrepresentation in the quality of the goods the defendant was selling, even when the product turned out to be what it was intended to be. For example, see Baxter v. Ford Motor Co., 168 Wash. 456, 462, 12 P.2d 409, 15 P.2d 1118, 88 A.L.R. 521 (1932). In that case the manufacturer ad-

vertised that "shatter proof" glass was contained in its cars. The plaintiff, in reliance on this representation, bought one of the cars from a dealer. The cars did not have shatter proof glass as they were advertised to have. The court held the manufacturer liable for a misrepresentation of all cars, even though the product turned out as it was supposed to be. Liability was not placed on the manufacturer for a condition that was unintended, nor due to its negligence. In the present case, liability could be placed on the manufacturer for its misrepresentation in the quality of the steering of all Thunderbirds, even if that steering was what it was intended to be.

The rule applicable to this case is stated in Section 402B [1] of the Restatement of Torts (2d Ed.). The rule is a clear pronouncement of the present status of the law as it affects this case. This rule, if followed, would hold the manufacturer or assembler and at the same time would hold the dealer to strict liability. Under Section 402B it is unnecessary that the "misrepresentation" be made fraudulently or negligently. The type of misrepresentation contained in the "Owner's Manual" renders not only the manufacturer or assembler liable, but extends to the dealer as well. The Court does not see fit to deal with the question of strict liability in the sense that it fails to discuss the theory of misrepresentation. The Court seems to assume that Puskar's misrepresentation theory excludes the idea that he also sought to establish liability upon the theory of warranty in the trial court. In taking this position, the Court loses sight of one other significant aspect of Section 402B, supra, under the misrepresentation theory (which is also a warranty) Puskar did not have the burden of proving a "defect" as such. In showing

that the Thunderbird was not as represented or advertised, Puskar established that the quality of the Thunderbird was not as represented. The Thunderbird was defective in the sense that it would not perform as warranted. Thus, it is not important whether the misrepresentation form of "strict liability" be classified as an "express" or an "implied" warranty. I cannot agree with the Court of Civil Appeals wherein it holds otherwise. This Court's holding that there is no evidence to support a holding of strict liability is untenable. The Court seems to adhere to a theory that strict liability is not absolute liability, and since there is no proof that a *"defect"* existed at the time the Thunderbird left Ford's control, there can be no liability. Obviously, the Court has completely ignored the evidence in this case which shows that Ford has made a misstatement in its "Owner's Manual" of a material fact, the quality of 1959 Thunderbirds in general. The Court seems to give very little, if any, weight to the testimony which shows that the representations in the Owner's Manual were read and understood by Puskar. The Court gives no significance to the testimony that the salesman for Roach made the same representations orally to Puskar that were contained in the "Owner's Manual". The Court has failed to properly evaluate the evidence and apply the law apparently because some argument is made that Puskar does not make his position clear in his briefs. The evidence, in my judgment, and Puskar's arguments in the light of such evidence, demands that Texas fall in line with many jurisdictions and not permit the defendants, the manufacturer and the dealer, to define the scope of their responsibility through the specious argument that Puskar failed to show a particular "defect" in the Thunderbird existed before it left the control of the manufac-

---

1. "Misrepresentation by Seller of Chattels to Consumer

"One engaged in the business of selling chattels who, by advertising, labels, or otherwise, makes to the public a misrepresentation of a material fact concerning the character or quality of a chattel sold by him is subject to liability for physical harm to a consumer of the chattel caused by justifiable reliance upon the misrepresentation, even though

(a) It is not made fraudulently or negligently, and

(b) the consumer has not bought the chattel from or entered into any contractual relation with the seller."

turer. It may be argued that so far as the dealer is concerned, the position taken in this dissent runs contrary to our holding in Bowman Biscuit Co. of Texas v. Hines, 151 Tex. 370, 251 S.W.2d 153 (1952). Such is not the case. The factual background there was entirely different from the facts here. In *Bowman*, we said in regard to hidden imperfections, such as a small wire in a sealed package, the consumer must be deemed to have relied on the care of the manufacturer and *not* the wholesaler. Thus, we refused to extend the doctrine which had been previously announced by this Court in Decker & Sons, Inc. v. Capps, 139 Tex. 609, 164 S.W.2d 828, 142 A.L.R. 1479 (1942). There was no contention in that case that misrepresentations were made in an "Owner's Manual" and that the purchaser read, understood and relied upon the representations. Cases in other jurisdictions which support my position in addition to Baxter v. Ford Motor Co., supra, are: Worley v. Procter & Gamble Mfg. Co., 241 Mo.App. 1114, 253 S.W.2d 532 (1952); Rogers v. Toni Home Permanent Co., 167 Ohio St. 244, 147 N.E.2d 612, 75 A.L.R.2d 103 (1958); Greenman v. Yuba Power Products, Inc., supra, and a number of others.

I think it appropriate to quote from the opinion in Greenman v. Yuba Power Products, Inc., supra, a case decided by the Supreme Court of California, in order to point up my views as to the disposition to be made of the present case:

> "We need not recanvass the reasons for imposing strict liability on the manufacturer. They have been fully articulated in the cases cited above. (See also 2 Harper and James, Torts, §§ 28.15–28.16, pp. 1569–1574; Prosser, Strict Liability to the Consumer, 69 Yale L.J. 1099; Escola v. Coca Cola Bottling Co., 24 Cal. 2d 453, 461, 150 P.2d 436, concurring opinion.) The purpose of such liabiltiy is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the in-

jured persons who are powerless to protect themselves. Sales warranties serve this purpose fitfully at best. (See Prosser, Strict Liability to the Consumer, 69 Yale L.J. 1099, 1124–1134.) *In the present case, for example, plaintiff was able to plead and prove an express warranty only because he read and relied on the representations of the Shopsmith's ruggedness contained in the manufacturer's brochure.* Implicit in the machine's presence on the market, however, was a representation that it would safely do the jobs for which it was built. Under these circumstances, it should not be controlling whether plaintiff selected the machine because of the statements in the brochure, or because of the machine's own appearance of excellence that belied the defect lurking beneath the surface, or because he merely assumed that it would safely do the jobs it was built to do. It should not be controlling whether the details of the sale from manufacturer to retailer and from retailer to plaintiff's wife were such that one or more of the implied warranties of the sales act arose. (Civ.Code, § 1735). 'The remedies of injured consumers ought not to be made to depend upon the intricacies of the law of sales.' (Ketterer v. Armour & Co., D.C., 200 F. 322, 323; Klein v. Duchess Sandwich Co., 14 Cal.2d 272, 282, 93 P.2d 799.) To establish the manufacturer's liability it was sufficient that plaintiff proved that he was injured while using the Shopsmith in a way it was intended to be used as a result of a defect in design and manufacture of which plaintiff was not aware that made the Shopsmith unsafe for its intended use." [Emphasis added.]

It is clear that the California Supreme Court's opinion stands for the proposition that the plaintiff in *Greenman* was *able to plead and prove an express warranty* "only because he read and relied on the representations * * *." Puskar proved, just as Greenman, that he was injured while using the Thunderbird in the way it was in-

tended to be used and that "as a result of a defect and design and manufacture" of which he was not aware. While in *Greenman* there was evidence introduced that inadequate set screws were used to hold parts of a machine together, etc., the Court did not rest its holding on this testimony in imposing strict liability. Recovery was allowed because of reliance upon the representations contained in the manufacturer's brochure.

When we look solely to the evidence in a light most favorable to the jury findings, as we are required to do, such evidence, in my opinion, supports the findings. Therefore, the judgment of the trial court in favor of Puskar and against Ford and Roach in the sum of $60,815.33 on the theories of breach of warranty and negligent misrepresentation should be sustained. The extent of the damages sustained by Puskar is not in dispute. Ford and Roach seem to admit that the theory of law which allows recovery upon proof of negligent misrepresentation is well recognized in this and other jurisdictions, but argue that there was no evidence as to the falsity of the representations, hence, there is a complete absence of negligence. I do not agree with this argument.

Ford and Roach have taken portions of the evidence out of context and presented arguments thereon. Thus, they have successfully led the Court of Civil Appeals to interpret the representations contained in the Owner's Manual contrary to the interpretation by Puskar of the language of the manual. It is not unreasonable to conclude, as Puskar argues, that the representation was intended to assure the buyer that the power steering system was a great aid when working but that when it failed he would have the same type of steering as he would have had "if he had not been induced to buy the power package." The Court of Civil Appeals has evolved an erroneous test [2] in arriving at its definition of "conventional steering", hence its erroneous conclusion: "The result is that no witness testified to facts from which the inference could reasonably be drawn that the representation was false." The Court of Civil Appeals in disregarding all of the evidence in support of Puskar's theory has done so because of its unwarranted interpretation of "the clear misrepresentation that when the engine stops or fails the advertised victim will 'have safe steering and full control of your car with conventional steering.' "

It is clear from the evidence that regardless of the extent to which Puskar's ability

2. "Here appellee [Puskar] bases his support of the jury's answers on the contention that the representation was that without the power steering operating the operator still would have safe steering and full control of the car with conventional steering. *Conventional steering, he [Puskar] asserts, means the same steering as an automobile not equipped with a power steering system would have.* He then urges it takes more exertion to turn the steering wheel where the automobile is equipped with a power steering system where the power system is not operating, than it does to steer an automobile not so equipped because if the power system does not operate additional manual force is needed to force the fluid through the linkage.

"First, we must look at the whole of the language used by Ford to determine what its representation really was. The very first sentence of the representation about power steering states: 'Up to 75% of the effort needed to steer your Thunderbird is taken over by Master-Guide Power Steering. * * *' Then in the next paragraph this is stated: 'Master-Guide Steering provides power assist only when your Thunderbird's engine is running.' Then follows the statement that if the power system is not operating the operator will have 'safe steering and full control' of the car 'with conventional steering.' When all of the language is considered *the representation is that if the power system is not working you will still have safe steering and control of the car because you will still have steering but it will require 75% more effort to operate than when the power system is working. The representation thus defines what is meant by conventional steering. And the opinion of all the experts is that with such you should be able to control the car.*" [Emphasis added.]

to control the Thunderbird was affected by sudden engine failure, and loss of power steering, the jury was warranted in believing that the engine failed on the Thunderbird while Puskar was operating it under normal and reasonable circumstances, and that such failure resulted in his inability to control the vehicle in the same manner as would have been true had it been equipped only with conventional steering.

The judgment of the trial court should be affirmed.

POPE, J., joins in this dissent.

## ON MOTION FOR REHEARING

WALKER, Justice.

◾ In his motion for rehearing, plaintiff says that we failed to pass on his contention that the verdict and judgment are sustainable against Ford upon the breach of an implied warranty of fitness. After the present case was decided, we adopted the rule of strict liability in tort as applicable to products which cause physical harm to persons. McKisson v. Sales Affiliates, Inc., Tex.Sup., 416 S.W.2d 787. An essential element of the plaintiff's case under that rule is proof that he was injured because the product was in a defective condition when it left the hands of the particular seller. See Restatement, Second, Torts § 402A; Prosser, The Fall of the Citadel, 50 Minn.Law Rev. 791. It was pointed out in our original opinion in the present case that there is no evidence to support a finding that the accident was caused by a defect existing at the time the automobile was delivered to plaintiff, and this disposes of his asserted right to recover upon the theory of breach of an implied warranty of fitness.

◾ Plaintiff also says that in view of the representation in the owner's manual as to what the steering mechanism would do upon a power failure, it was not necessary to show a defect. He insists that failure of performance as represented is sufficient to establish his case. The rule upon which plaintiff relies subjects the seller of a chattel to strict liability when physical harm results from a misrepresentation of the character or quality of the chattel. See Restatement, Second, Torts § 402B. The owner's manual did not state that the vehicle was so perfectly constructed that the steering mechanism would never fail to function properly. It simply assured the plaintiff that his automobile was so designed and built that he would have safe steering and full control in the event of a loss of power. The previous experience of another driver with the particular vehicle indicates that the representation was true, and what caused the malfunction on the occasion in question is not disclosed and cannot fairly be inferred from the evidence. It is our opinion that under the facts of this case, the single unexplained failure does not in itself establish that the steering mechanism was not of the character or quality indicated by the manual.

The motion for rehearing is overruled.